**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01745

STELLA O'NEAL,

     Plaintiff,

v.

MEGAN BURKE, RN, individually;
JESSICA TYLER, LPN, individually;
LAURA JOLLY, RN, individually;
DEBRA REILLY, PA, individually,
TIFFANY NEARY, PA, individually.

     Defendants.

_____

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY**
_____

Plaintiff, Stella O'Neal by and through her attorneys of record, Leventhal Puga Braley P.C., and Levin Sitcoff PC, for her Complaint for Damages and Jury Demand, states and alleges as follows:

## INTRODUCTION

1. At all relevant times, Stella O'Neal ("Ms. O'Neal") was incarcerated at the Denver Women's Correctional Facility ("DWCF") in Denver, Colorado.

2. The DWCF is one of two women's correctional facilities in the Colorado Department of Corrections ("CDOC").

3. The DWCF is the largest women's correctional facility in CDOC.

4. DWCF houses women at all custody levels.

5. The DWCF is located in CDOC's Denver Complex.

6.    The Denver Reception and Diagnostic Center is also located in the Denver Complex.

7.    The DRDC processes all inmates into CDOC.

8.    The DRDC has advanced medical facilities, including, a Dialysis Unit, an Infirmary, and, a Special Medical Needs Unit.

9.    Inmates can move between the DWCF and DRDC without leaving the secured perimeter of the Denver Complex.

10.    While incarcerated at DWCF, Ms. O'Neal repeatedly complained to medical staff that she had increasingly worsening pain in her foot, and, among other things, described the pain as "like frostbite."

11.    Despite Ms. O'Neal's pleas for medical care and obviously dire condition, Defendants, who are medical professionals entrusted with caring for patients at DWCF, disregarded her complaints and medical condition.

12.    Prior to this incident, Defendants knew Ms. O'Neal was at high risk for complications, including blood clots, related to her underlying medical conditions.

13.    Defendants had multiple opportunities to fulfill their gatekeeper roles and ensure Ms. O'Neal received timely and appropriate medical care to prevent a substantial risk of pain and suffering, infection, ischemia, tissue necrosis, amputation, and death.

14.    Defendants consciously disregarded these risks and violated her Constitutional rights by delaying and/or refusing to fulfill their gatekeeper and medical caregiver roles.

2

15. On September 3, 2024, Ms. O'Neal declared a medical emergency from her cell and reported symptoms consistent with a blood clot; her cellmate likewise alerted personnel to Ms. O'Neal's wailing in pain.

16. Ms. O'Neal complained of persistent, emergent, and worsening pain, swelling, discoloration in her foot over the course of several more days, during which she sought medical attention multiple times.

17. Ms. O'Neal's obvious medical emergency went untreated until it was too late to save her leg.

18. After Defendants failed to treat and denied access to medical personnel capable of evaluating her condition for over 60 hours, Ms. O'Neal was finally allowed to be seen by a doctor, at which point medical providers immediately found multiple blood clots.

19. After undergoing emergent surgical procedures to save her leg, Ms. O'Neal was diagnosed with "irreversible left foot ischemia," meaning permanent loss of blood flow and tissue death to the left foot due to blood clots in the area around Ms. O'Neal's ankle.

20. On September 11, 2024, as a result of Defendants' deliberate indifference to her known serious medical needs, Ms. O'Neal's left leg was amputated below the knee.

21. Had DWCF medical staff timely sent Ms. O'Neal to the hospital, the more advanced clinics in the corrections complex, or otherwise provided access to medical personnel and equipment capable and necessary to treat and evaluate her condition, she would not have been forced to undergo a painful and life-altering leg amputation.

22. Defendants' actions and inactions permanently disabled and disfigured Ms. O'Neal.

## JURISDICTION, VENUE, NOTICE

23. This action arises under the Constitution and laws of the United States, Including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

24. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

25. Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

26. Personal jurisdiction over each Defendant is conferred under Federal Rule of Civil Procedure 4(d)(1).

27. This case is brought in the United States District Court for the District of Colorado under 28 U.S.C. § 1391 as the judicial district where all relevant events and omissions occurred.

28. All available administrative remedies have been exhausted to the extent required by any applicable and federal law.

## PARTIES

29. At all relevant times, Stella O'Neal was a resident and domiciliary of Colorado and was a citizen of the United States.

30. At all relevant times, Ms. O'Neal was confined to the DWCF.

4

31.     At all relevant times, Ms. O'Neal's medical care was exclusively controlled and provided by the Colorado Department of Corrections, including the Defendants in this action.

32.     At all relevant times, Meagan Burke, RN, was a citizen of the United States and a resident of Colorado. Upon information and belief, Defendant Burke was an agent, employee, and/or subcontractor placed in the Colorado Department of Corrections ("CDOC") working at DWCF. This Defendant was responsible for providing medical care to Plaintiff during her incarceration. At all relevant times, this Defendant was acting under color of state law in her capacity as a nurse for the CDOC and is sued for deliberately indifferent actions in this capacity. Upon information and belief, this Defendant was employed by a private company, and not a governmental agency. As such, she is not entitled to qualified immunity, nor is she entitled to any immunity under the Colorado Governmental Immunity ("CGIA") on Colorado state law claims.

33.     At all relevant times, Jessica Tyler, LPN, was a citizen of the United States and a resident of Colorado. Upon information and belief, Defendant Tyler was an agent, employee, and/or subcontractor placed in the Colorado Department of Corrections ("CDOC") working at DWCF. This Defendant was responsible for providing medical care to Plaintiff during her incarceration. At all relevant times, this Defendant was acting under color of state law in her capacity as a nurse for the CDOC and is sued for her deliberately indifferent actions in this capacity. Upon information and belief, this Defendant was employed by a private company, and not a governmental agency. As such, she is not

entitled to qualified immunity, nor is she entitled to any immunity under the Colorado Governmental Immunity ("CGIA") on Colorado state law claims.

34.    At all relevant times, Laura Jolly, RN, was a citizen of the United States and a resident of Colorado. Upon information and belief, Defendant Jolly was an agent, employee, and/or subcontractor placed in the Colorado Department of Corrections ("CDOC") working at DWCF. This Defendant was responsible for providing medical care to Plaintiff during her incarceration. At all relevant times, this Defendant was acting under color of state law in her capacity as a nurse for the CDOC and is sued for her deliberately indifferent actions in this capacity. Upon information and belief, this Defendant was employed by a private company, and not a governmental agency. As such, she is not entitled to qualified immunity, nor is she entitled to any immunity under the Colorado Governmental Immunity ("CGIA") on Colorado state law claims.

35.    At all relevant times, Debra Reilly, PA, was an employee of the Colorado Department of Corrections ("CDOC") working at DWCF and was a resident of Colorado. This defendant was responsible for providing medical care to Plaintiff during her incarceration. At all relevant times, this Defendant was acting under color of state law in her capacity as a Mid-Level Provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

36.    At all relevant times, Tiffany Neary, PA, was an employee of the Colorado Department of Corrections ("CDOC") working at DWCF and was a resident of Colorado. This defendant was responsible for providing medical care to Plaintiff during her incarceration. At all relevant times, this Defendant was acting under color of state law in

her capacity as a Mid-Level Provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

**STATEMENT OF FACTS**

37.    Ms. O'Neal only 40 years old when her leg was amputated due to an entirely preventable medical condition.

38.    Ms. O'Neal entered into the custody of the Colorado Department of Corrections ("CDOC") on June 20, 2024.

39.    At intake, DWCF knew that Ms. O'Neal had a history of embolism, deep vein thrombosis, pulmonary hypertension and disease, sickle-cell trait, and venous insufficiency, among other conditions.

40.    This history was known to medical professionals, including Defendants, at DWCF.

41.    Ms. O'Neal also gave birth just four months prior to her entry into CDOC in June 2024.

42.    During all relevant times, Ms. O'Neal was authorized to pump breast milk to send home to her baby.

43.    Ms. O'Neal's conditions require regular, frequent, and ongoing medical supervision and care to prevent complications.

44.    Because CDOC knew this, CDOC designated her as a Chronic Care patient.

45.    Per CDOC's Administrative Regulation ("AR") 700-02 (the "Chronic Care Protocol" regulation), those with chronic disease or other significant health concerns "will

receive ongoing care provided by physicians or mid-level providers," and will receive a "chronic care treatment plan" that "must give directions to Clinical Services employees and contract workers regarding care that includes monitoring of medications, laboratory testing, chronic care clinics, health record forms, and the frequency of follow-up appointments, and the specialty consultations and reviews."

46.    On July 24, 2024, Ms. O'Neal met with Tiffany Neary, PA ("PA Neary"), a medical professional employed by CDOC at DWCF, for a Chronic Care visit.

47.    During this Chronic Care visit, which, per Chronic Care Protocol should have encompassed the creation of a Chronic Care treatment plan.

48.    PA Neary documented that she only met with Ms. O'Neal for "minutes," and upon information and belief, did not create a Chronic Care plan.

49.    During the brief July 2024 Chronic Care visit, PA Neary documented that Ms. O'Neal's history of acute embolism, thrombosis of unspecified deep veins of unspecified distal lower extremity, circulatory chronic condition, digestive system issues, musculoskeletal/connective issues, and respiratory issues.

50.    PA Neary also noted that Ms. O'Neal was postpartum, had a history of pulmonary embolism in 2009, had LE (lower extremity) deep vein thrombosis in 2023 while she was pregnant and on the blood thinner Lovenox.

51.    Ms. O'Neal experienced issues while taking Lovenox, and for the safety and health of herself and her baby, and in consultation with her doctors, stopped taking the medication while she was breastfeeding.

52.     So, in July 2024, medical professionals at DWCF, including PA Neary, knew that Ms. O'Neal had a history of blood clots, including in her legs, knew she was temporarily off of her blood thinners, knew CDOC regulations required a Chronic Care plan, and knew they did not have a Chronic Care plan in place for Ms. O'Neal.

53.     CDOC officials, including Defendants, permitted and/or assisted Ms. O'Neal's use of a breast pump to mail milk to her newborn son.

54.     All of this was documented on CDOC's electronic medical record-keeping system, Marquis electronic Offender Management Information System ("eOMIS").

55.     CDOC began using eOMIS in 2017, so Ms. O'Neal's patient record, including her medical history, lab results, health encounters, medication administration, and other clinical information was readily accessible to medical staff at DWCF, including Defendants, from 2017 onwards.

56.     Accordingly, all medical professionals at DWCF had the ability to freely access and review Ms. O'Neal's medical history and health record directly in eOMIS.

57.     As of at least July 24, 2024, medical personnel, including Defendants, knew and had full access to the records confirming that Ms. O'Neal had a history of blood clots, medical conditions that made her more susceptible to blood clots, and was not currently taking blood thinning medication.

58.     Even basic medical professionals receive training on identifying signs and symptoms of deep vein thrombosis and pulmonary embolisms and other serious blood clot conditions.

9

59.     For example, even standard, basic emergency medical technician ("EMT") training programs train EMTs to recognize symptoms, risk factors, and provide emergency management to patients.

60.     The National Council Licensure Examination ("NCLEX"), a mandatory, nursing licensure examination for entry-level nurses, requires examiners to identify risk factors, recognize symptoms, and determine appropriate interventions for patients with a diagnosis of pulmonary embolism or deep vein thrombosis.

***September 3, 2024***

61.     At or around 1:18am on September 3, 2024, Ms. O'Neal declared a medical emergency for pain which had developed in her left foot.

62.     She was seen in her cell by Defendant Meagan Burke, RN ("Nurse Burke").

63.     Nurse Burke wrote that Ms. O'Neal was unable to walk to the clinic, had left foot pain that had worsened that night, and that the pain felt the worst in Ms. O'Neal's left big toe.

64.     Nurse Burke wrote that Ms. O'Neal stated "she feels her L foot is not getting circulation and says that it feels cold. She has taken Tylenol with no effect."

65.     The medical record from this encounter also states that Ms. O'Neal's roommate, Dedranette Samuels ("Ms. Samuels"), informed Nurse Burke that Ms. O'Neal had been crying in pain for hours.

66.     At that time, Nurse Burke touched and examined Ms. O'Neal's foot while Ms. O'Neal cried in pain.

67.     Nurse Burke instructed Ms. O'Neal to report discoloration of foot, paresthesias, or edema.

68.     Discoloration of foot, paresthesias, and edema are common symptoms of a blood clot.

69.     Nurse Burke undertook no further diagnostic work up.

70.     As a medical professional familiar with Ms. O'Neal and her medical history, Nurse Burke knew that Ms. O'Neal had several underlying medical conditions which rendered her more susceptible to blood clots, that she was not currently taking blood thinning medication, and that she was reporting classic signs of impaired blood flow to her foot.

71.     A blood clot is a mass of coagulated blood that forms within a blood vessel and blocks the normal flow of blood.

72.     When a blood clot forms, it can prevent oxygenated blood from reaching downstream tissue. Without oxygen, tissue injury begins.

73.     This process causes severe pain, pallor, coldness, discoloration, loss of pulse, and ultimately tissue necrosis.

74.     When tissue necrosis occurs, the dead tissue breaks down and creates an environment where bacteria spread freely, which can lead to sepsis and multi-organ failure.

75.     Without timely and appropriate intervention, a blood clot causes a substantial risk of serious harm.

76. Nurse Burke was aware that Ms. O'Neal faced a substantial risk of serious harm if left untreated.

77. When someone has a medical history of blood clots, conditions that make them more susceptible to blood clots, and is exhibiting obvious signs of circulatory compromise, they need to be immediately assessed to rule out a blood clot or sent to a medical facility or hospital where such care can be provided.

78. As a trained medical professional, Nurse Burke knew or should have known, that Ms. O'Neal's symptoms indicated a potentially life-threatening circulatory medical emergency, and that time was of the essence in diagnosing and treating the emergency to prevent a substantial risk of serious harm.

79. Nurse Burke failed to fulfill her gatekeeper role by delaying and/ or refusing to provide emergency medical treatment for Ms. O'Neal, by telling Ms. O'Neal to come to the medical clinic at DWCF (the "Clinic") later that morning for a follow-up appointment.

80. Nurse Burke did not immediately obtain lab work, an ultrasound examination, or send Ms. O'Neal to an advanced clinic or a hospital where such diagnostics could be performed without delay.

81. Medical professionals at DWCF commonly transfer patients to DRDC to receive higher-level medical care that cannot be administered at DWCF.

82. Upon information and belief, DRDC has imaging equipment and medical staff that DWCF does not have.

83.     Upon information and belief, the imaging equipment at the DRDC is the type of equipment needed to assess and diagnose a blood clot such as the one Ms. O'Neal had.

84.     Instead of transferring Ms. O'Neal to this facility located in the same CDOC Denver complex, Nurse Burke left Ms. O'Neal to languish in her cell.

85.     At 6:00 am, on September 3, 2024, PA Reilly gave verbal orders for a series of lab tests, including a CBC with Differential/Platelet, Sedimentation Rate, C-Reactive Protein and a Complete Metabolic Panel.

86.     At the point at which PA Reilly ordered these tests, it would be reckless not to have clotting on her differential diagnosis; the signs and symptoms to that point are signs and symptoms which basic EMT certificate classes teach are indicative of blood clots. In light of PA Reilly's experience, training, and education, and Ms. O'Neal's known history and presentation, failing to have clotting on the differential at that juncture would be deliberately indifferent.

87.     In the alternative, if PA Reilly had clotting on the differential when she ordered this test, as any medical personnel must have, then it was deliberately indifferent to suspect a life- or limb-threatening condition and not treat it emergently or even have a person with the knowledge or ability to do so see Ms. O'Neal; if, as is likely, PA Reilly suspected a clot, had not ruled it out, and failed to treat or escalate care, that demonstrates conscious disregard for Ms. O'Neal's life and health.

88.     These labs are incomplete for the appropriate diagnostic work up of Ms. O'Neal's symptoms.

13

89.     These labs should have and could have been ordered "stat" based upon the severity of Ms. O'Neal's symptoms.

90.     Further, once the labs were resulted, they were not reviewed by a healthcare provider in a timely manner.

91.     At or around 9:50am on the same morning, September 3, 2024, Defendant Jessica Tyler, LPN ("LPN Tyler"), Defendant Debra Reilly, PA ("PA Reilly") and Laura Jolly, RN ("Nurse Jolly") saw Ms. O'Neal in the Clinic.

92.     LPN Tyler wrote that Ms. O'Neal arrived by wheelchair.

93.     LPN Tyler wrote that Ms. O'Neal stated "For the past few days my left foot has really been in pain. Its like a sharp ache and my big toe really hurts. Its like an 8/10 but when I stand on it its like a 10/10. My left foot feels really cold and I think I don't have any circulation on this foot […]"

94.     This is a description of the signs and symptoms of an arterial clot.

95.     LPN Tyler wrote "Pt c/o feeling as though she has very little circulation of the left foot, c/o it feeling cold and reports she has to bundle that foot at night to keep it warm."

96.     LPN Tyler wrote "Pt right foot warm, dry, and skin intact and appropriate color for ethnicity, pulse ox of pinky toe registers @94% RA, bottom of foot pink and warm."

97.     LPN Tyler wrote "Pt. left foot noticeably cooler than the left, pale on the bottom and blanches easily, ***pulse ox does not register on toes of L foot***, this morning nurse was able to get 95% on great toe."

98.    A pulse oximeter ("pulse ox") measures pulse rate and oxygen saturation.

99.    So, at approximately 10am on September 3, 2024, Defendants knew that Ms. O'Neal no longer had pulsatile blood flow throughout her foot.

100.    A cessation of pulsatile flow in combination with a hypothermic and pale foot indicates an interruption of arterial blood flow.

101.    Interruptions in arterial flow are medical emergencies.

102.    All Defendants knew during all relevant times, that an interruption in arterial flow was a life or limb threatening medical emergency.

103.    LPN Tyler wrote "Possible Raynaud's in L foot – undecided."

104.    Upon information and belief, LPN Tyler, PA Reilly, and Nurse Jolly told Ms. O'Neal that she could be suffering from vasculitis.

105.    Vasculitis, or the inflammation of blood vessels, is known to medical professionals to decrease blood supply and create a substantial risk of blood clots.

106.    Each of the Defendants, including LPN Tyler, PA Reilly, and Nurse Jolly, knew that vasculitis was a diagnosis that carried a substantial risk of serious harm to Ms. O'Neal if left untreated.

107.    Each of the Defendants, including LPN Tyler, PA Reilly, and Nurse Jolly, knew that vasculitis is a medically serious and time-sensitive condition that should be treated as an emergency until proven otherwise.

108.    Each of the Defendants, including LPN Tyler, PA Reilly, and Nurse Jolly, knew that vasculitis, if not immediately attended to, could result in ischemia, tissue necrosis, sepsis, amputation, and death.

109.    The standard of care requires that when one of the possible, or differential, diagnoses, is life or limb-threatening, the medical professional must address that condition first.

110.    Ms. O'Neal's blood was collected at 10:53am on September 3, 2024, but PA Reilly did not send it to LapCorp, the laboratory responsible for processing the blood, until midnight on September 4, 2024.

111.    Despite knowing Ms. O'Neal's risk factors, and that she was experiencing symptoms indicating a medical emergency, PA Reilly did not even order these labs "STAT."

112.    At the time she decided to do nothing more than order lab tests, PA Reilly was aware that it would take time to receive the results, and that time was of the essence.

113.    Given Ms. O'Neal's reports of pain and decreased circulation in her foot, her medical history, and objective indicators of impaired circulation, including coldness and blanching in her left foot, PA Reilly should have escalated the response to Ms. O'Neal's symptoms.

114.    PA Reilly denied Ms. O'Neal access to the medical treatment facilities at the DRDC or a hospital.

115.    PA Reilly knew that ordering labs would not do anything to slow the progression of a blood clot or otherwise prevent Ms. O'Neal from suffering the consequences of an untreated blood clot, including ischemia, tissue death, sepsis, amputation, and death.

116.   But rather than timely and adequately address this medical emergency, PA Reilly, LPN Tyler, and Nurse Jolly merely directed Ms. O'Neal to "use heat to affected foot for now, will order non-formulary Capsaicin Ointment to help with circulation in foot."

117.   LPN Tyler noted they would order "non-formulary Capsaicin Ointment to help with circulation in foot."

118.   Capsaicin ointment is made from chili peppers.

119.   Capsaicin is a topical analgesic used to relieve minor aches and pains in muscles and joints by desensitizing skin nerve cells. It is often used to treat nerve pain by providing the patient with a warming sensation to the affected area.

120.   Capsaicin ointment is not a remedy for a blood clot because it merely provides symptomatic skin-level pain relief.

121.   Defendants, including PA Reilly, knew that Capsaicin ointment was not a remedy for a blood clot.

122.   Ms. O'Neal's obvious and documented symptoms, including coldness and pallor of the foot, absent toe pulse-ox signal, and worsening severe pain, are classic signs of limb ischemia.

123.   As a medical provider with decades of experience, PA Reilly knew or should have known that Ms. O'Neal required emergency medical treatment.

124.   Given that PA Reilly, LPN Tyler, and Nurse Jolly should have known a blood clot was on Ms. O'Neal's differential diagnosis, they should have ruled the condition out before ordering nerve pain ointment for Ms. O'Neal.

125.    Instead, PA Reilly, LPN Tyler, and Nurse Jolly prematurely committed to a less-serious diagnosis. Their deliberate choice to do so caused a substantial risk of harm to Ms. O'Neal; namely, that her blood clot would worsen and cause a risk of ischemia, amputation, and death.

126.    Nevertheless, PA Reilly, LPN Tyler, and Nurse Jolly instructed Ms. O'Neal to keep her body warm could help prevent "attacks." Ms. O'Neal was also told to "try soaking your hands or feet in warm water" and that "stress and certain medicines can trigger attacks."

127.    Defendants failed to identify the cause of Ms. O'Neal's severe pain or to send Ms. O'Neal to a hospital capable of making a diagnosis and properly treating Ms. O'Neal.

128.    LPN Tyler, PA Reilly, and Nurse Jolly knew that Ms. O'Neal had been using heat for over nine hours without any symptom relief, and knew that instructing her to continue would not help her pain, and certainly wouldn't prevent a major circulatory event such as a blood clot.

129.    Ms. O'Neal followed instructions and continued to use heat on her foot.

130.    Ms. O'Neal continued to suffer from increasingly severe pain.

131.    It was clear to Ms. O'Neal's roommate, Ms. Samuels, that Ms. O'Neal required immediate medical care.

132.    Ms. Samuels observed that Ms. O'Neal's foot was a different color than the rest of her body and was cold to the touch.

133. Ms. Samuels observed, and reported to Defendants, that Ms. O'Neal had not slept for days and had been experiencing pain that was not alleviated by the use of Tylenol, Motrin, or warm compresses.

134. At or around 11:22am, on the same date, September 3, 2024, PA Reilly saw Ms. O'Neal *again* for emergently for pain in her left big toe.

135. PA Reilly noted that Ms. O'Neal had a history of lupus, vasculitis, Raynaud's syndrome, and pulmonary hypertension.

136. As a medical professional, PA Reilly knew that these conditions are associated with inflamed or narrowed blood vessels, hypercoagulability, and thrombotic events, *i.e.*, clotting.

137. Again, PA Reilly had access to Ms. O'Neal's medical history in eOMIS, and had reviewed Ms. O'Neal's patient record in eOMIS. As such, PA Reilly knew Ms. O'Neal had suffered a blood clot leading to pulmonary embolism less than a year prior, and was not currently on blood thinning medication. PA Reilly wrote that Ms. O'Neal "Stated it feels frozen, it is cold and very painful."

138. PA Reilly wrote "during exam toe changed from white to red to white."

139. PA Reilly wrote that she was able to find a pulse using a doppler.

140. PA Reilly also erroneously wrote that Ms. O'Neal's toe did not appear swollen and was not painful to the touch. By this point, Ms. O'Neal had been complaining of worsening pain in her toe for eleven hours, and her toe was visibly swollen, so much so that Ms. Samuels, a lay person, noticed the swelling.

19

141.    Taken together, these findings – a cold, painful foot with white-to-red-to-white color changes and only doppler-detectable pulses – are classic signs that a patient has impaired blood flow.

142.    If a pulse can only be detected using a doppler, and cannot be felt manually, it indicates reduced blood flow to the extremity.

143.    In a healthy limb or toe, pulses can be palpated by hand. A doppler, on the other hand, is an ultrasound device that is used when blood flow is weak or diminished such that a pulse is not strong enough to be felt manually.

144.    A pulse that is only detectable using a doppler is particularly concerning when it is accompanied by cold skin, pallor, severe pain, and a history of blood clots and circulatory conditions, because it indicates poor blood flow.

145.    Despite knowing from her medical history, risk factors, and symptoms that Ms. O'Neal faced a substantial risk of a life-threatening circulatory event in the near future without intervention, PA Reilly did not send Ms. O'Neal to the DRDC clinics or to a hospital.

146.    PA Reilly acted as a gatekeeper to Ms. O'Neal's medical care, and completely abdicated her gatekeeper role by refusing to send Ms. O'Neal to a hospital capable of evaluating and treating her medical condition.

147.    PA Reilly sent Ms. O'Neal back to her cell, despite Ms. O'Neal's reports of severe and worsening symptoms.

***September 4, 2024***

148.    Without meaningful intervention, Ms. O'Neal's condition worsened.

149. Ms. O'Neal's pain was so severe that she was unable to sleep, and instead spent the night sobbing in pain.

150. Ms. O'Neal was crying so hard throughout the night that Ms. Samuels was also unable to fall asleep.

151. Ms. O'Neal pressed the emergency button in her cell again.

152. At or around 1:37am on September 4, 2024, Nurse Burke noted that First responders were called to Unit 3 for Ms. O'Neal complaining of shortness of breath and foot pain.

153. Nurse Burke wrote "Pt states her L foot pain is 10/10, causing her to cry and hyperventilate […] Endorses "it feels like frostbite." Pt specifically points to L big toe when asked to identify her pain. Pain is constant, not effected by Tylenol or warm compress."

154. Upon information and belief, by then Ms. O'Neal was experiencing the deprivation of oxygen to tissue in her foot.

155. Patients subjected to this level of oxygen deprivation consistently describe the pain as searing, crushing, and consuming, frequently reporting it as the most excruciating pain they have ever experienced in their lives.

156. It was clear to any person, including a lay person, that Ms. O'Neal was experiencing a medical emergency requiring immediate attention.

157. Ms. O'Neal's roommate, Ms. Samuels, told Nurse Burke that Ms. O'Neal had not slept in the past twenty-four hours and had been crying in pain since the previous night.

21

158.   Ms. Samuels pleaded with Nurse Burke to send Ms. O'Neal to a hospital, and reported that Ms. O'Neal's toes were visibly blue, purple, green, and black.

159.   Nurse Burke knew of Ms. O'Neal's underlying conditions that made her more susceptible to developing a blood clot; and she wrote "[s]he is postpart and has hx of Lupus, RA, and thrombosis."

160.   Nurse Burke also wrote "multi autoimmune [history] with [history] of clots."

161.   In the medical setting, "thrombosis" commonly refers to the formation of blood clots inside a vessel which obstruct the flow of blood.

162.   Nurse Burke reviewed Ms. O'Neal's medical history in eOMIS, and knew PA Reilly had ordered capsaicin ointment the day before.

163.   Nurse Burke wrote "Pt has NF cream ordered; pt advised to wait for cream to come in this week and use it as prescribed for pain relief."

164.   Nurse Burke wrote "Pt encouraged to drink plenty of clear fluids and to continue taking Tylenol for pain. Pt advised to continue using warm compresses as well."

165.   Nurse Burke knew or should have known a blood clot was a potential diagnosis, knew or should have known that it wasn't ruled out, and knew or should have known that her instructions to Ms. O'Neal would not stop the progression of a life- and limb-threatening blood clot.

166.   Nurse Burke knew or should have known that Ms. O'Neal had been drinking fluids, taking pain relievers, and using warm compresses for over twenty-four hours without relief.

167.    Nurse Burke is required by licensure to report any abnormal nursing findings to a provider capable of diagnosing the disease, and required to escalate to a diagnosing provider any patient who needs a diagnosis quickly or whose needs are likely to exceed DWCF's capabilities.

168.    Nurse Burke did not contact a doctor or send Ms. O'Neal to a hospital for higher-level evaluation and treatment.

169.    As a nurse, Nurse Burke was acting as a gatekeeper to the level of care Ms. O'Neal needed, and her denial and/or delay of access to this level of care worsened Ms. O'Neal's suffering and was a cause of Ms. O'Neal's leg amputation.

170.    Nurse Burke consciously disregarded the substantial risk of harm that ultimately befell Ms. O'Neal – the risk that an untreated blood clot would require the amputation of Ms. O'Neal's leg to save her life.

171.    Nurse Burke left Ms. O'Neal in her cell to suffer the excruciating pain of tissue death.

172.    A few hours after Ms. O'Neal was seen by Nurse Burke, at 6:13am, Ms. O'Neal's lab results came back, with elevated platelet counts which are indicative of heightened risk of clotting.

173.    All Defendants had access to Ms. O'Neal's lab results through eOMIS throughout the day.

174.    The Defendants knew that PA Reilly ordered lab tests for Ms. O'Neal to confirm their suspicions that she was undergoing a life and limb-threatening medical emergency.

175. Upon information and belief, the Defendants wilfully elected not to check Ms. O'Neal's lab results on September 4, 2024.

176. In the alternative, they checked the lab results and willfully chose not to and/or delayed taking action in response or to the lab results which clearly indicated Ms. O'Neal's life and limb-threatening condition.

177. Instead, in the face of Ms. O'Neal's increasingly severe pain, documented medical history of blood clots, the Defendants took no action.

178. Specifically, none of the Defendants visited Ms. O'Neal again on September 4, 2024, communicated the results of Ms. O'Neal's lab work to her, or otherwise called Ms. O'Neal to the Clinic for observation or treatment.

***September 5, 2024***

179. At 9:49 am, on September 5, 2024, over twenty-four hours after receiving Ms. O'Neal's labs, Defendant LPN Tyler saw Ms. O'Neal in the clinic.

180. LPN Tyler wrote "Pt still reports extreme pain to [lower left extremity] with pain 9/10 and constant. Pt states she has not been able to sleep for the part 3-4 days."

181. LPN Tyler wrote "Pt with L foot pale with erythema noted along the side, purpura noted to great toe, on 9/3 toes were intermittently red and white. […] Pt reports last blood clot on 12/31/2023, on [right lower extremity] and pt was seen at Highlands Ranch University. Labs collected on 9/3 with noted elevated platelets."

182. LPN Tyler wrote "Hx of clots – r/o," indicating LPN Tyler knew Ms. O'Neal's history of clots, and that clotting needed to be ruled out as a source of Ms. O'Neal's ongoing symptoms first recognized by Defendants two days ago.

183. During this appointment, Ms. O'Neal again pleaded with LPN Tyler to take action, and stated emphatically that she would not leave the Clinic unless the Defendants sent her to a hospital.

184. LPN Tyler documented that Ms. O'Neal's labs showed elevated platelets.

185. Ms. O'Neal demanded she receive medical care.

186. At 10:00 am, 57 hours after the Defendants first observed Ms. O'Neal, PA Reilly initiated a transport to Denver Health Hospital "to [rule out] clots."

187. Despite the emergent and life-threatening nature of her condition, PA Reilly did not call for an emergency transport.

188. Instead, PA Reilly requested that Ms. O'Neal be transferred to a hospital non-emergently in a state van.

189. Thus, Ms. O'Neal did not depart from the Clinic until 11:30am, an hour and a half after PA Reilly determined that Ms. O'Neal needed to be seen in an emergency department to rule out blood clots (a diagnosis that, based upon prior documentation and lab orders, had been on all Defendants' differential for well over 24 hours).

190. As a result of the Defendants' delay in sending Ms. O'Neal to a hospital in a non-emergent state van, Ms. O'Neal was not evaluated at a hospital until 2:03pm.

191. PA Reilly was deliberately indifferent, including in her gatekeeper role, by delaying Ms. O'Neal's access to timely medical care in a hospital equipped with the tools to diagnose and treat this medical emergency.

25

***Denver Health Emergency Department***

192.    When Ms. O'Neal arrived at the Denver Health and Hospital Authority Emergency Department ("Denver Health ED"), she was seen by Marissa Wolfe, MD ("Dr. Wolfe"), who immediately confirmed that Ms. O'Neal was suffering from a blood clot in her leg.

193.    Dr. Wolfe wrote ""Given history and physical, differential includes arterial process – Raynauds, acute limb ischemia, occlusion 2/2 emboli; venous process – [deep vein thrombosis ("DVT")]; and cellulitis. Concern for acute limb ischemia due to decreased pulses of LLE, and history of hypercoagulable state. Lower extremity US did not show DVT, coagulation panel WNL, CT lower extremity showed 2.3 cm segment of nonopacification of the distal posterior tibial artery at the level of the ankle."

194.    In other words, Dr. Wolfe noted a weak pulse in Ms. O'Neal's left leg and Ms. O'Neal's medical history of blood clots, and concluded that Ms. O'Neal likely had a blockage in an artery near her ankle.

195.    Dr. Wolfe diagnosed Ms. O'Neal less than two hours after she arrived at the Denver Health ED.

196.    On physical exam, Dr. Wolfe was unable to feel certain pulses in Ms. O'Neal's lower left leg/foot.

197.    At 3:51pm, Joseph Burke, MD, performed a peripheral catheterization procedure, which is used to try and identify and/or break up clots.

198.    Dr. Burke noted that Ms. O'Neal had blockages in two of the three main arteries that carry blood to the lower leg and foot, and was forming another blockage in the third main artery.

199.    After the procedure, Dr. Burke confirmed that several of Ms. O'Neal's left leg arteries were completely blocked by clots, causing a dangerous loss of circulation.

200.    Dr. Burke was able to restore some blood flow, but had to leave a catheter in place to administer medication that dissolves blood clots, called TPA, along with a blood thinning medication called Heparin, in hopes that Ms. O'Neal's blood clot would or could resolve without further intervention.

201.    At 9:54 a.m. on September 6, 2024, Shea Hogan, MD ("Dr. Hogan"), performed a catheter procedure called a "mechanical thrombectomy" to physically remove the blood clot in Ms. O'Neal's leg. So, within several hours of her arrival to the ED, Ms. O'Neal was diagnosed with blood clots and underwent two separate procedures to try and restore blood flow.

202.    Dr. Hogan performed two more catheter procedures on September 7th and September 8th.

203.    However, the catheter procedures were unsuccessful, and on September 9, 2024, medical professionals noted that Ms. O'Neal's pulse had been lost and her left leg was increasingly swollen.

204.    At 10:48 am, on September 9, 2024, three days after Ms. O'Neal was brought to the Denver Health ED, the vascular surgeon consulting on Ms. O'Neal's case, Bala Ramanan, MD ("Dr. Ramanan"), wrote that Ms. O'Neal had "severe ischemic and

possible necrotic tissue […] We strongly recommend a below-knee amputation to address tissue ischemia and to prevent sepsis."

205.    Ms. O'Neal's condition required immediate amputation of her leg to save her life, because the tissue in her leg had died off to an irreversible degree during the time between clot formation and medical intervention, due to Defendants' delay in diagnosing and treating Ms. O'Neal and otherwise fulfilling their duties as gatekeepers of Ms. O'Neal's medical care.

206.    In this moment of crisis, when any patient would normally be surrounded by family to support making this irreversible and life-altering decision, Ms. O'Neal's ability to speak with her loved ones was reduced to a matter of institutional "permission."

207.    The social worker attending to Ms. O'Neal wrote that "the warden has granted special permission for pt to have a 30 min phone call per day."

208.    After having just thirty minutes to process and discuss this news with her loved ones, Ms. O'Neal elected to forgo amputation for the time being , since she hoped there was some way to save her leg.

209.    But by September 10, 2024, Ms. O'Neal had not improved, and was reporting worsening left foot pain, had a recurrent fever, and had worsening tachycardia.

210.    On September 11, 2024, after declaring that Ms. O'Neal had "a nonsalvageable left foot," Ms. O'Neal's medical team informed her that she required an emergency amputation; she had no choice but to agree.

211.    Later that day, Dr. Ramanan, and Andrea Simioni, MD, performed a below-knee amputation (a "guillotine" amputation) on Ms. O'Neal's left leg.

212. The indication for the procedure was "[i]schemic left foot with nonreconstructible occlusive disease." The tissue in her leg was unsalvageable and needed to be removed.

213. On September 14, 2024, Ms. O'Neal underwent another procedure wherein Dr. Ramanan formalized the amputation.

214. Had Ms. O'Neal presented to the Denver Health ED earlier in the clot formation process – *i.e.*, at, around, or within a reasonable number hours of when she began reporting symptoms—her leg would not have required amputation.

215. After the amputation, Dr. Hogan, who attempted to save Ms. O'Neal's leg through multiple catheterization procedures, wrote the following statement addressed to DWCF staff:

> The patient's left leg amputation was directly related to her delayed presentation. Had she presented to a hospital shortly after her symptoms began (within 24 hours), there is a very high chance that her leg could have been saved. It is also important to note that an imperative aspect of her post-amputation management will be regular physical therapy to ensure she develops good function with her limb prothesis [sic]. If she does not undergo regular physical therapy, there is a high likelihood of long-term disability. Additionally, Ms. Oneal [sic] needs regular follow-up to treat her underlying medical conditions, which will be very important to decrease the risk of dangerous blood clots in the future. If these management strategies are not possible in Ms. Oneal's current situation, then she needs transfer to an institution that accommodate [sic] these needs.

> Ms. Oneal has given me permission to disclose her medical information, and I would be happy to discuss her course and currently [sic] medical needs further. Thank you for your time.

216. Defendants could have, and should have, sent Ms. O'Neal to a hospital equipped with the tools to treat her when she began showing symptoms of a blood clot.

217. Defendants had multiple opportunities to do so.

218.    Instead, Defendants' inaction and delay of care in the face of a known, serious risk of a blood clot caused Ms. O'Neal to undergo the following:

- Days of excruciating pain at DWCF;
- Multiple painful, invasive procedures at the Denver Health ED in an attempt to save her leg;
- A below the knee amputation of her left leg;
- Subsequent procedures to formalize the amputation;
- Anxiety, depression, and trauma over losing her leg;
- Weeks, months, and years of painful rehabilitation;
- Phantom limb pain;
- The use of a prosthetic leg;
- Complications, including but not limited to hip pain, related to the prosthetic leg; and
- Ongoing, lifelong medical care and supervision.

219.    Over the course of her hospitalization, Ms. O'Neal expressed deep devastation, anxiety, and frustration over Defendants' conscious disregard of her concerns and severe pain for days, thus causing her substantial harm, including permanent physical injury and intermediate injuries including pain and suffering.

220.    Ms. O'Neal had to relearn how to stand, how to walk, and how to perform basic self-care, rebuilding from scratch the abilities she had her entire life until Defendants' deliberate indifference caused her to lose her leg.

221.    Ms. O'Neal was discharged from Denver Health and transported to the Infirmary at the Denver Reception and Diagnostic Center ("DRDC") on September 19, 2024.

222.    A medical staff member at DRDC documented that Ms. O'Neal was admitted to the Infirmary "while figuring out safe discharge planning for a medically

30

complex patient" and that medical staff at DWCF had not been responsive to attempts to discuss Ms. O'Neal's plan of care.

223. On September 23, 2024, Ms. O'Neal was discharged from the Infirmary at DRDC back to DWCF, with plans in place to return to the Denver Health ED in a couple of weeks to remove sutures in her leg.

224. After Ms. O'Neal returned to DWCF, on October 4, 2024, she complained of pain in her right foot.

225. The nurse evaluating Ms. O'Neal, Alexis Quatro, RN, noted that Ms. O'Neal's right foot was swollen, red, and painful.

226. Nurse Quatro contacted PA Neary, who recommended sending Ms. O'Neal to Denver Health due to concerns that Ms. O'Neal was developing another blood clot.

227. Because Ms. O'Neal received timely medical care this time around, the medical staff at Denver Health were able to treat Ms. O'Neal without resorting to invasive, life-altering amputation.

228. The Defendants could have, and should have, taken the same swift action with respect to Ms. O'Neal's left leg. The feasibility of such action is apparent from the action they undertook with respect to the right leg.

229. While at DWCF, Ms. O'Neal underwent months of hospital visits, physical therapy, rehabilitation, and monitoring by outside medical professionals to manage her condition as an amputee.

230. Ms. O'Neal was granted parole on June 25, 2025.

231. Ms. O'Neal was released from DWCF on July 10, 2025.

232.    Ms. O'Neal walked into CDOC custody on two legs, but left with only one leg.

233.    As the mother of a toddler and a baby, Ms. O'Neal's life changed forever.

234.    As a result of the Defendants' failure to take action in the face of known, substantial risks of harm to Ms. O'Neal, she can no longer walk independently, take care of her young children, or find gainful employment.

235.    Ms. O'Neal continues to experience substantial difficulties in adapting to life as an amputee, including participating in rehabilitation and physical therapy aimed at increasing her independence, ability to ambulate, and ability to use a prosthetic leg.

236.    Ms. O'Neal wears a prosthetic leg but continues to experience pain due to the prosthetic.

237.    A prosthesis is an assistive tool a patient uses, not a restoration to normal function, and brings lifelong physical complications.

238.    Ms. O'Neal will continue to chronically experience nerve pain, hypersensitivity, and pressure pain due to Defendants' deliberate indifference.

239.    As an amputee, Ms. O'Neal is at a higher risk for falling and suffering injuries for the rest of her life.

240.    Ms. O'Neal has permanently lost independence and faces lifelong physical and emotional consequences as a result of Defendants' deliberate indifference, which caused her to be permanently disfigured.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983: Deliberately Indifferent Medical Care in Violation of the Eighth Amendment*
*(Against Each and All Individual Defendants)[1]*

241. Plaintiff hereby incorporates the paragraphs above as if fully set forth herein.

242. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress […]

243. Ms. O'Neal was a citizen of the United States.

244. Defendants to this claim are persons for the purpose of 42 U.S.C. § 1983.

245. Ms. O'Neal had a clearly established right under the Eighth Amendment of the United States Constitution to be free from deliberate indifference and reckless disregard for her known serious medical needs as well as from cruel and unusual punishment.

---

[1] This claim proceeds exclusively on the Eight Amendment because CDOC, through in response to a public records request, has advised that at the time of the injury all medical providers were directly employed through CDOC. If, in fact, that constitutes misrepresentation, the government cannot avoid claims by misrepresenting public information. To that end, in light of the informational asymmetry of the parties and the statutes of limitations pertaining to this matter, Plaintiff asks the Court to take judicial notice of such representations and, if they are untrue and some or all medical providers named herein were privately employed/contracted at the time of injury preserve all rights to amend the Complaint. Plaintiff believes it would be appropriate for the Court to issue a limited order requiring production of proof as to employment of named Defendants upon entry of appearance to avoid any misrepresentation to circumvent meritorious claims.

33

246.    As of the time of Ms. O'Neal's medical emergency, it was clearly established that delaying or denying treatment to a patient with obvious symptoms of a potentially serious and life and limb-threatening circulatory condition is deliberate indifference.

247.    Each Defendant, at all relevant times, was acting under color of state law.

248.    Each Defendant is individually liable to Ms. O'Neal for violation of 42 U.S.C. § 1983.

249.    Defendants, as willful participants in a joint activity, had actual knowledge of Ms. O'Neal's serious medical needs and deteriorating condition.

250.    With deliberate indifference, Defendants failed to appropriately evaluate the source of Ms. O'Neal's severe and worsening foot pain.

251.    Defendants were deliberately indifferent in delaying and denying Ms. O'Neal's transport to a medical facility to obtain higher-level medical care. None of the Defendants could treat a blood clot on their own, and each had a constitutional obligation not to deny and delay transport to the appropriate level of medical care for Ms. O'Neal's condition.

252.    Nurse Burke was deliberately indifferent to Ms. O'Neal's serious medical needs as described in the Statement of Facts.

253.    Not only was the severity and life-threatening nature of Ms. O'Neal's medical condition obvious, but Nurse Burke was consciously aware that Ms. O'Neal was experiencing constant and worsening pain in her foot which felt like frostbite, shortness of breath, discoloration of her foot, and that a pulse ox could not register a pulse on Ms. O'Neal's toes, and that Ms. O'Neal had a history of blood clots and conditions that made

34

her susceptible to blood clots, and was not currently taking blood thinning medication. Nurse Burke also knew that DWCF did not have the resources to further evaluate and treat Ms. O'Neal's medical emergency. Nurse Burke nonetheless made no effort to get Ms. O'Neal the medical care she obviously required.

254. LPN Tyler was deliberately indifferent to Ms. O'Neal's medical needs as described in the Statement of Facts.

255. Not only was the severity and life-threatening nature of Ms. O'Neal's medical condition obvious, but LPN Tyler was consciously aware that Ms. O'Neal was experiencing constant and worsening pain in her foot which felt like frostbite, shortness of breath, discoloration of her foot, and that a pulse ox could not register a pulse on Ms. O'Neal's toes, and that Ms. O'Neal had a history of blood clots and conditions that made her susceptible to blood clots, and was not currently taking blood thinning medication. LPN Tyler also knew that DWCF did not have the resources to further evaluate and treat Ms. O'Neal's medical emergency. LPN Tyler nonetheless made no effort to get Ms. O'Neal the medical care she obviously required.

256. Nurse Jolly was deliberately indifferent to Ms. O'Neal's medical needs as described in the Statement of Facts.

257. Not only was the severity and life-threatening nature of Ms. O'Neal's medical condition obvious, but Nurse Jolly was consciously aware that Ms. O'Neal was experiencing constant and worsening pain in her foot which felt like frostbite, shortness of breath, discoloration of her foot, and that a pulse ox could not register a pulse on Ms. O'Neal's toes, and that Ms. O'Neal had a history of blood clots and conditions that made

her susceptible to blood clots, and was not currently taking blood thinning medication. Nurse Jolly also knew that DWCF did not have the resources to further evaluate and treat Ms. O'Neal's medical emergency. Nurse Jolly nonetheless made no effort to get Ms. O'Neal the medical care she obviously required.

258.    PA Reilly was deliberately indifferent to Ms. O'Neal's medical needs as described in the Statement of Facts.

259.    Not only was the severity and life-threatening nature of Ms. O'Neal's medical condition obvious, but PA Reilly was consciously aware that Ms. O'Neal was experiencing constant and worsening pain in her foot which felt like frostbite, shortness of breath, discoloration of her foot, and that a pulse ox could not register a pulse on Ms. O'Neal's toes, and that Ms. O'Neal had a history of blood clots and conditions that made her susceptible to blood clots, and was not currently taking blood thinning medication. PA Reilly also knew that DWCF did not have the resources to further evaluate and treat Ms. O'Neal's medical emergency. PA Reilly nonetheless made no effort to get Ms. O'Neal the medical care she obviously required.

260.    PA Reilly was deliberately indifferent in failing to send Ms. O'Neal to the Denver Health ED emergently, and caused further delay to Ms. O'Neal's access to timely and appropriate medical care.

261.    Each of the Defendants was also deliberately indifferent in failing to take any action for over twenty-four hours after receiving Ms. O'Neal's abnormal blood results. Each Defendant could have escalated the response and transported Ms. O'Neal to a facility capable of treating her.

36

262. Defendants' inaction represents a willful and wanton disregard and deliberate indifference to Ms. O'Neal's civil rights.

263. Defendants' inaction represents reckless disregard for the substantial risk of physical harm to Ms. O'Neal.

264. Defendants are not entitled to governmental immunity.

265. Upon information and belief, because Nurse Burke and Nurse Tyler were employed by a private company that contracts with CDOC, and not a governmental agency, they are not entitled to qualified immunity.

266. As a direct and proximate result of Defendants' unlawful conduct, Ms. O'Neal has suffered injuries and losses, including the permanent amputation of her leg, entitling her to recover her compensatory and special damages, including for the loss of constitutional rights, loss of enjoyment of life, loss of consortium, pain and suffering, permanent lost earnings and earning capacity, past and future medical expenses, and other special damages, all in amounts to be proven at trial.

267. Ms. O'Neal is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and pre- and post-judgment interest as allowed by law.

268. In addition to compensatory, economic, consequential and special damages, Ms. O'Neal is entitled to recover punitive damages against each Defendant under 42 U.S.C. § 1983, in that their actions and inactions were malicious, reckless, or with willful and wanton disregard for Ms. O'Neal's constitutional rights.

## PRAYER FOR RELIEF

Plaintiff requests that this Court enter judgment in her favor and against each of the Defendants and enter the following relief:

a. All available compensatory, non-economic, consequential, and special damages, including, but not limited to, for pain and suffering, physical, mental and emotional distress, and all other economic and non-economic damages allowable by law;

b. Punitive damages on all claims allowed by law in an amount to be determined at trial against the individual Defendants;

c. Attorney's fees and costs;

d. Pre- and post-judgment interest as appropriate; and

e. Any further relief this Court deems just and proper.

### PLAINTIFF REQUESTS TRIAL BY JURY.

Dated this this 24th day of April, 2026

Respectfully submitted,

LEVIN SITCOFF PC

*/s/ Annika Adams*
Robyn Levin
Annika Adams
455 Sherman St., Ste. 490
Denver, CO 80203
Telephone: (303) 575-9390
robyn@lsw-legal.com
annika@lsw-legal.com

AND

38

LEVENTHAL PUGA BRALEY P.C.

Alex R. Wilschke
Adrian G. Johnson
Brian N. Aleinikoff
950 S Cherry St., Suite 600
Denver, CO 80246
Telephone: (303) 759-9945
awilschke@leventhal-law.com
brian@leventhal-law.com
ajohnson@leventhal-law.com
*Attorneys for Plaintiff*

***Plaintiff's Address:***
22545 E Ontario Drive, D204
Aurora CO, 80016